IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| | * |
| TRICE, GEARY & MYERS, LLC, | |
| *et al.*, | * |
| | |
| Plaintiffs, | * |
| | |
| v. | *    CIVIL NO.: WDQ-09-2754 |
| | |
| CAMICO MUTUAL INSURANCE | * |
| COMPANY, | |
| | * |
| Defendant. | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Trice, Geary & Myers, LLC ("TGM") and Kevin E. Myers sued
CAMICO Mutual Insurance Company ("CAMICO") for breach of
contract and a declaratory judgment on the duty to defend.
CAMICO counterclaimed for declaratory judgment on the duty to
indemnify.  Pending are the Plaintiffs' motions for partial
summary judgment and to dismiss, and CAMICO's motion for summary
judgment.  For the following reasons, the Plaintiffs' motions
will be denied, and CAMICO's motion for summary judgment will be
granted.

I.   Background[1]

TGM is an accounting firm in Salisbury, Maryland.  Compl. ¶
4.  In 2007 and 2008, TGM purchased "claims made and reported"
Accountants Professional Liability Insurance Policies from
CAMICO ("the Policy").  *See* Compl. Ex. B-1 [hereinafter *APLIP*];
Answer Ex. 1.[2]  Kevin Myers is a Certified Public Accountant and
principal of TGM who is insured under the Policy.  Compl. ¶ 5;
APLIP § II.b.

Under the Policy, CAMICO agreed to indemnify[3] and defend[4]
the insured against claims arising out of their provision of

---

[1]   For the motion to dismiss, the well-pled allegations in the
Complaint are accepted as true.  *See Mylan Labs., Inc. v.
Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  In the motions for
summary judgment, the Court will draw inferences from the facts
in the light most favorable to the non-moving party.  *See
Matsushita Elec. Indus. Co. v. Zennith Radio Corp.*, 475 U.S.
574, 587 (1986).

[2]   Two policies have been filed: (1) Policy No. MDL01151-05
effective from July 1, 2007 to July 1, 2008 was attached to the
complaint; (2) Policy No. MDL01151-06 effective July 1, 2008 to
July 1, 2009 was attached to CAMICO's answer.  The relevant
terms of the two policies are identical.  For clarity, "the
Policy" will refer to Policy No. MDL01151-05 unless otherwise
indicated.

[3]   Subject to certain limitations, Section I.A.1 required CAMICO
to "pay those sums that the Insured becomes legally obligated to
pay as *Damages* because of a Claim arising out of an Insured's
negligent act, error or omission in rendering or failing to
render Professional Services."  APLIP § I.A.1 (emphasis in
original).

[4]   Section I.B.1 gives CAMICO "a right and duty to defend and
settle Claims alleging Damages potentially covered by this
Policy, even if the Claim is groundless, false or fraudulent."
APLIP § I.B.1.

professional services.  *Id.* §§ I.A.1, I.B.1.  "Professional Services" generally include activities (1) performed by an insured that benefit TGM, or (2) undertaken by an insured as a member of a professional board or committee related to the accounting profession.  *Id.* § IV.o.  Activities "performed by an [i]nsured in his/her capacity as an agent or broker for the placement or renewal of insurance products or for the sale of annuities" are not considered "professional services."  *Id.* at Special Exclusion Endorsement.

The Policy's limits of liability are $5,000,000 per claim and $10,000,000 in the aggregate.  *Id.* at 5.  Covered "claims" include, *inter alia*, suits filed against the insured for money or services.  *Id.* § IV.c.  The Policy limits coverage to $100,000 for damages and claims expenses[5] "arising from, related to or in connection with any Tax Shelter Investment."[6]  *Id.* § I.C.1.a.

---

[5]  "Claims expenses" include "the fees charged by an attorney designated by [CAMICO] to defend any [i]nsured, and all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a claim, if incurred by an [i]nsured at [CAMICO]'s request."  APLIP § IV.d.

[6]  A "Tax Shelter Investment" is:

1.  (i)  a Treasury Regulation § 1.6011-4(b)(2) "reportable transaction"; OR
    (ii) any investment or other arrangement where (a) the investment or other arrangement actually generates or (b) representations made as part of the investment or other arrangement's written

Claims in connection with or arising out of services provided by

the insured acting in another capacity[7] or products sold or

distributed by the insured are excluded from coverage entirely.[8]

*Id.* § III.d.  A "Special Exclusion Endorsement" to the Policy

also excludes claims "in connection with or arising out of any

act, error or omission by any [i]nsured in his/her capacity as

an agent or broker for the placement or renewal of insurance

---

> sale offering indicate that the investment or
> arrangement will generate taxable income
> exclusions, tax deductions, or tax credits
> exceeding the investment or other arrangement's
> required capital contribution by at least two to
> one (2:1); OR
>
> (iii) any other investment, plan or arrangement having
> tax avoidance or evasion as its primary purpose.
> An investment, plan or arrangement will have a
> primary tax avoidance or evasion purpose when
> that purpose exceeds any other purpose of the
> investment, plan or arrangement; AND
>
> 2. Any [i]nsured receives or expects to receive any
> compensation or other payment, whether or not related
> to Professional Services rendered, which is a
> commission, profit-sharing, participation, payment in
> securities, success fee, or similar kind of payment
> dependent upon the completion or success of the
> transaction.

APLIP § IV.s.

[7] The Policy does not cover claims "in connection with or arising out of the services of any Person who is an [i]nsured acting as an employee, officer or director of any company, business, entity or charitable organization other than [TGM]." APLIP § III.d.

[8] The Policy does not cover "Products Liability" claims made "in connection with or arising out of the use of, or existence of any condition in or warranty of, products sold or distributed by an [i]nsured." APLIP § IV.j.

4

products or for the sale of annuities." *Id*. at Special
Exclusion Endorsement.

On June 2, 2008, Thomas R. Ruark and affiliated entities[9]
sued Hartford Life & Annuity Insurance Company ("Hartford") and
others[10] in Baltimore County Circuit Court for claims arising
from the sale of a defined benefit pension plan funded by
Hartford life insurance policies (the "DBP Plan") to Baja
Holdings in September 2003 (the "Hartford Action").[11]  Compl. Ex.
B-3 ¶¶ 4, 13, 28.  The Hartford Defendants allegedly marketed
the DBP Plan to Baja Holdings as a way to obtain significant tax
benefits under Section 412(i) of the Internal Revenue Code.  *Id*.
¶¶ 13, 23.  Though Myers and TGM were not defendants, the
complaint alleged that Myers--acting as a TGM accountant and tax
advisor--recommended the DBP Plan to Ruark and Baja Holding
without disclosing that he was a Hartford agent and would
receive a commission from the sale.  *Id*. ¶¶ 17-18, 26-27.
Relying on Myer's tax advice, Baja Holdings purchased the DBP
Plan ("the Baja Policy") and established Baja DBP to be funded

---

[9]  The Plaintiffs were: Ruark; Baja Holdings, Inc. ("Baja
Holdings"); and Baja Holdings, Inc. Defined Benefit Plan ("Baja
DBP") (collectively the "Hartford Plaintiffs").

[10]  The Defendants were: Hartford, Michael A. Dimayo, and
Insurance Alternatives, Inc. ("IAI") (collectively the "Hartford
Defendants").

[11]  *See Ruark et al. v. Hartford Life & Annuity Ins. Co. et al.*,
Case No. 03-C-08-006022 OT (filed June 2, 2008).

through life insurance policies purchased from Hartford. *Id*. ¶¶ 18, 28.

In 2004, the IRS made several rulings about funding 412(i) plans. *Id*. ¶¶ 34-36. The complaint alleges that Myers "acting as [an] agent[] of Hartford . . . wrongly represented to [the Hartford] Plaintiffs that the Revenue Rulings would not affect them," which induced Ruark and Baja Holdings to pay Hartford additional premiums and file tax returns without the required forms for a listed transaction. *Id*. ¶ 36. In 2006, an IRS audit of Baja DBP disclosed numerous defects in the Baja Policy. *Id*. ¶ 37. As a result of the Hartford Defendants' alleged misrepresentations, the Hartford Plaintiffs have incurred substantial audit-related expenses and may be liable for impermissible deductions taken in connection with the Baja Policy. *Id*. ¶ 38.

In January 2009, Myers and TGM learned that Ruark and his affiliates intended to pursue claims against them for the Baja Policy transaction unless a settlement was negotiated. Ronald B. Klein Cert. ¶ 4, Ex. A, Dec. 21, 2009. Myers and TGM gave notice to CAMICO of these "potential claims" under the Policy. *Id*. ¶ 5. On February 13, 2009, CAMICO informed Myers and TGM that it "owe[d] no coverage obligation under the Policy in connection with [that] claim." *Id*. at Ex. B at 1. CAMICO explained that any accounting and financial services provided by

6

Myers associated with the sale of the Baja Policy had been in his capacity as an agent of Hartford. *Id*. at 6.  Thus, his activities were outside the scope of "professional services" covered by the Policy and within the "Special Exclusion Endorsement," "Insured Acting in Another Capacity," and "Products Liability" exclusions to coverage. *Id*. at 6-7.

On April 10, 2009, IAI filed a third party complaint in the Hartford Action for indemnification and contribution against, *inter alia*, TGM and Myers.  Compl. Ex. B-4 ¶¶ 19-25, 34-35.  On April 24, 2009, Ruark and his affiliates sued Myers and TGM in Wicomico County Circuit Court for negligence and negligent misrepresentation in connection with the Baja Policy transaction (the "Ruark Action").[12]  *Id*. at Ex. B-2 ¶¶ 13-14, 19-20.  On June 3, 2009, Arbitration & Mediation, Inc. (A&M), Caleb L. Fowler, and his wife Lynne V. Fowler sued Myers and TGM in Somerset County Circuit Court, alleging that Myers had recommended a DBP Plan--similar to the Baja Policy--for A&M without disclosing his financial interest in the transaction (the "Fowler Action").[13] *Id*. at Ex. B-5 ¶¶ 13-17.  CAMICO has refused to defend TGM and Myers in the Hartford, Ruark, and Fowler Actions (collectively the "underlying actions").

---

[12]  See Thomas H. Ruark, et al. v. Kevin Myers, et al., Case No. 22-C-09-000708 (filed Apr. 24, 2009).

[13]  *See Caleb L. Fowler, et al. v. Kevin Myers, et al.*, Case No. 19-C09-013249 (filed June 23, 2009).

On September 14, 2009, TGM and Myers sued CAMICO in Wicomico County Circuit Court for breach of contract and a declaration of CAMICO's obligation under the Policy to defend TGM and Myers in the underlying actions.  Compl. ¶¶ 40-50.  On October 22, 2009, CAMICO removed that case to federal court based on diversity jurisdiction.  Notice of Removal ¶ 11.  On October 29, 2009, CAMICO filed its answer and counterclaims for a declaration that it "owed and owes no . . . indemnity obligation concerning the underlying actions" and for attorneys' fees.  Answer at 11-16.

On November 11, 2009, the Plaintiffs filed a motion to dismiss the counterclaim, Paper No. 15, and a motion for partial summary judgment, requesting (1) a declaration that CAMICO must provide them with a defense in the underlying actions, (2) expenses incurred in defending themselves "in an amount to be determined," and (3) attorney fees and costs incurred in bringing this action, Paper No. 14 at 20.  On December 21, 2009, CAMICO filed a cross-motion for summary judgment on all the claims and counterclaim.  Paper No. 18 at 2.

II.  Analysis

   A.   Standards of Review

        1.   Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted.

Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.,* 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To present a facially plausible complaint, a plaintiff must do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts as pleaded must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" the plaintiff is entitled to relief. *Id*. at 1950 (*citing* Fed. R. Civ. P. 8(a)(2)). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged--but it has not shown--that the pleader is
entitled to relief." *Id*. (internal quotation marks omitted).

The Court "should view the complaint in a light most
favorable to the plaintiff," and "accept as true all well-
pleaded allegations," *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130,
1134 (4th Cir. 1993), but the Court is "not bound to accept as
true a legal conclusion couched as a factual allegation,"
*Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "allegations
that are mere[] conclus[ions], unwarranted deductions of fact,
or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726, 730
(4th Cir. 2002).

> 2.   Rule 56

Under Rule 56(c), summary judgment "should be rendered if
the pleadings, the discovery and disclosure materials on file,
and any affidavits show that there is no genuine dispute as to
any material fact and that the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(c).  In considering a
motion for summary judgment, "the judge's function is not . . .
to weigh the evidence and determine the truth of the matter but
to determine whether there is a genuine issue for trial."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A
dispute about a material fact is genuine "if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party." *Id*. at 248.  The Court must "view the

evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr.*, *Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

B.   APLIP Policy

1.   Choice of Law

"In a diversity action, [the] law of the forum court governs the substantive issues, and federal law governs the procedural issues." *Lampe v. Kim*, 105 Fed. Appx. 466, 468 (4th Cir. 2004) (*citing Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002)). Maryland's choice of law rules govern. *See id.; Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999). Maryland courts follow the rule of *lex loci contractus*, which provides that the construction of a contract is determined by the law of the state where the contract was made. *Allstate Ins*. *Co. v. Hart*, 327 Md. 526, 611 A.2d 100, 101 (Md. 1992). The parties appear to agree that the contract was made in Maryland, and Maryland law governs the interpretation of the Policy.

2.    Duty to Defend

The parties have filed cross motions for summary judgment on CAMICO's duty to defend the Plaintiffs in the underlying actions. *See* Paper Nos. 14 & 18.  The Plaintiffs argue that CAMICO has a duty to defend them because the claims in the underlying complaints arise, in part, from covered Professional Services.  Paper No. 14 at 10-13.  CAMICO argues that it has no duty to defend because the allegations in the underlying actions all relate to Myers's sales of the DBP Plan in his capacity as a Hartford agent, activities which are barred from coverage by the "Special Exclusion Endorsement" and the "Products Liability" exclusion.  Paper No. 18 at 13-22.

Maryland courts recognize that "[t]he promise to defend the insured, as well as the promise to indemnify, is the considera-tion received by the insured for payment of the policy premiums." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 392 (Md. 2006) (*quoting Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842, 851 (Md. 1975)).  Because the primary purpose of litigation insurance is to "protect[] the insured from the expense of defending suits brought against him," *Brohawn*, 347 A.2d at 851, "[t]he duty to defend an insured is broader than the duty to indemnify," *Utica Mut. Ins. Co. v. Miller*, 130 Md. App. 373, 746 A.2d 935, 939 (Md. Ct. Spec. App. 2000).

"Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Brohawn*, 347 A.2d at 850.[14]  "If there is a possibility, even a remote one, that the plaintiff's claims could be covered by the policy, there is a duty to defend." *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 695 A.2d 566, 572 (Md. 1997).  Thus, the insurer is generally obligated to defend *all* claims in an action against the insured if *any* claims are potentially covered. *Utica Mut.*, 746 A.2d at 940.

To determine whether a liability insurer must defend its insured in a tort suit, Maryland courts consider: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in

---

[14]  Though an *insurer* may not contest the potentiality of coverage using extrinsic evidence, an *insured* may use extrinsic evidence to show a potential for coverage under the insurance policy. *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 651 A.2d 859, 863-64 (Md. 1995).  "[W]hen a complaint fails to assert tort allegations that are sufficient to establish potentiality of coverage, an *insured* is permitted to introduce extrinsic evidence that attempts to bring the action within the ambit of coverage under the insurance policy." *Montgomery County Bd. of Educ. v. Horace Mann Ins. Co.*, 154 Md. App. 502, 840 A.2d 220, 225 (Md. Ct. Spec. App. 2003) (emphasis added).  Although Myers and TGM were not parties to the original Hartford suit, the Plaintiffs may use the allegations in that complaint as extrinsic evidence of the potentiality of coverage under the Policy.

the tort action potentially bring the tort claim within the policy's coverage?" *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282, 285 (Md. 1981).[15] Accordingly, the court "must ascertain the scope and limitations of coverage under the . . . insurance policies and then determine whether the allegations in the [underlying] action[s] would potentially be covered under those policies." *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 651 A.2d 859, 862 (Md. 1995).

To interpret the scope and limitations of an insurance policy, the court must "construe the instrument as a whole to determine the intention of the parties." *Clendenin Bros.*, 889 A.2d at 393.  First, the court examines the contract language chosen by the parties. *Cole v. State Farm Mut. Ins. Co.*, 338 Md. 131, 656 A.2d 779, 784 (Md. 1995).[16]  Words in the contract are given their "usual, ordinary and accepted meaning" unless there is evidence that a special or technical meaning was intended by the parties. *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 556 A.2d 1135, 1138 (Md. 1989).  If the language used is plain and unambiguous, the court will determine the

---

[15]  "The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit." *St. Paul*, 438 A.2d at 285.

[16]  "An insurance contract . . . is measured by its terms unless a statute, a regulation, or public policy is violated thereby." *Litz*, 695 A.2d at 569.

meaning of contract terms as a matter of law.   *Clendenin Bros.*,
889 A.2d at 393.   But, if the language is ambiguous,[17] the court
may look to extrinsic evidence.   *Id.*

Under the Policy, CAMICO has a duty to defend TGM and its
employees against claims "arising out of . . . [a] negligent
act, error or omission in rendering or failing to render
Professional Services" unless those claims are within an
exclusion.   APLIP § I.A.1.   By a "Special Exclusion Endorse-
ment," the Policy expressly excluded from coverage "any [c]laim
in connection with or arising out of any act, error or omission
by any [i]nsured in his/her capacity as an agent or broker for
the placement or renewal of insurance products or for the sale
of annuities."   *Id.* at Special Exclusion Endorsement.[18]

Given their common understanding, the words "arising out
of" mean "originating from, growing out of, flowing from, or the
like."   *Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299,

---

[17]   A term is ambiguous when a reasonably prudent person would
find it "susceptible to more than one meaning."   *Cole*, 753 A.2d
at 537.

[18]   Also excluded from coverage are "Products Liability" claims
made "in connection with or arising out of the use of, or
existence of any condition in or warranty of, products sold or
distributed by an [i]nsured."   *Id.* § III.j.   The parties dispute
whether the DBP Plan is a "product" for the purposes of this
exclusion.   *See* Paper No. 20 at 13-14.   Because the Special
Exclusion Endorsement clearly bars coverage of the Underlying
actions, this Court need not determine whether the DBP Plan
sales are also within this exclusion.

708 A.2d 298, 305 (Md. 1998)(*quoting N. Assurance Co. of Am. v.
EDP Floors, Inc.*, 311 Md. 217, 533 A.2d 682, 688 (Md. 1987)).
The words "in connection with" ordinarily mean associated with,
related to, or the like.  The stated purpose of the Special
Endorsement Exclusion was to preclude coverage of "any claims in
connection with or arising out of or relating to . . . acts,
errors, or omissions in the rendering or failure to render
services as an insurance agent or broker" by the insured.  APLIP
at Special Exclusion Endorsement.  Considered in this context,
the phrase "in connection with or arising out of" reinforces the
intended breadth of this Policy exclusion.[19]

     The Plaintiffs seek to distinguish between the allegations
against them as insurance agents--which are within the Special
Endorsement Exclusion--and the allegations against them as
professional accountants and financial advisors, which are not.
All the underlying claims are "in connection with or arising out
of" Myers's sale and promotion of the DBP Plans in his capacity
as an agent or broker of Hartford, and under the Special
Exclusion Endorsement, any of the Plaintiffs' alleged acts,

---

[19]  Although the words "insurance product" and "annuity" are not
defined in the Policy, the parties appear to agree that the DBP
Plans are within the definition of one or both of those terms.
*See* Paper No. 21 at 10.  Similarly, the Plaintiffs appear to
concede that Myers was acting, at least in part, as an "agent or
broker" of Hartford during the DBP Plan transactions.  *See* Paper
No. 23 at 2.

errors, and omissions connected with the DBP Plan sales are

excluded from coverage.[20]

An examination of the underlying complaints shows that all

the Plaintiffs' alleged acts and omissions--even those arguably

made in their sole capacity as accountants and financial

advisors--were connected with the DBP Plan sales.[21]  Because the

---

[20]  CAMICO notes "the exclusion is not written to bar claims that
'exclusively' or 'solely' seek redress for an accountant acting
as agent for the sale of insurance product, but, instead, bars
claims [that] simply have a connection with or arise out of such
conduct even if other conduct is also alleged."  Paper No. 23 at
3.

[21]  In the IAI Third Party Action, the complaint alleges that
Myers, as an employee of TGM, gave incorrect tax advice about
the application of Internal Revenue Code Section 412(i) to the
DBP Plan and failed to disclose his affiliation with Hartford
and financial interest in the sale of the Baja Policy.  Compl.
Ex. B-4 ¶¶ 6-7, 20.  The complaint in the Ruark Action similarly
alleges that "[i]n early 2003, Myers, purporting to act as an
accountant and tax advisor for Ruark . . . and Baja Holdings,
recommended and proposed that . . . [they] create Baja DBP,"
which was to be funded through life insurance policies and would
qualify as a defined benefit plan under Section 412(i).  Compl.
Ex. B-2 ¶ 13.  It further alleges that TGM and Myers promoted
the Baja Policy, encouraged the Ruark Plaintiffs to continue
paying premiums even after unfavorable IRS Guidance was
published, and failed to disclose their financial interest in
the Baja Policy transaction.  Id. ¶¶ 14-20, 23-26, 30-31, 33-34.
The Fowler Action alleged that TGM and Myers recommended the DBP
Plan to the Fowler Plaintiffs, told them that it would qualify
under Section 412(i) without properly investigating IRS
Guidance, advised them that it was not a "listed transaction"
under the Internal Revenue Code, failed to disclose that they
would receive a commission on its sale, filed improper tax
documents for the DBP Plan, and failed to advise and gave
incorrect advice regarding the effect of newly published IRS
Guidance on the DBP Plan.  Compl. Ex. B-5 ¶¶ 13-17, 20-24, 26-
27, 29-36, 46, 56.  Even though Myers and TGM were not
originally parties to the Hartford Action, that complaint made

allegations against Myers and TGM in the underlying complaints are all "in connection with or arising out of" activities excluded by the Special Exclusion Endorsement, CAMICO has no duty to defend and is entitled to summary judgment.[22]

### 2.   Duty to Indemnify

CAMICO's counterclaim requests a declaration that, under the Policy, it does not have any indemnity obligation in the underlying actions.  Answer 16.  Under Maryland law, when there is no potentiality of liability coverage under an insurance policy, there may be no duty to indemnify.  *See Progressive Cas. Ins. Co. v. Dunn*, 106 Md. App. 520, 665 A.2d 322, 324 (Md. Ct. Spec. App. 1995).  Because the Policy does not cover any of the claims made in the underlying actions, CAMICO may not be liable for indemnification and must be granted summary judgment on its declaratory judgment counterclaim.

### 3.   Attorneys' Fees

Without providing a legal basis for its claim, CAMICO requested an award of costs and attorneys' fees associated with this action.  Answer 16.  The Plaintiffs argue that Maryland law does not provide for recovery of costs and attorneys' fees by an

---

allegations against TGM and Myers similar to those in the other underlying complaints.  *See* Compl. Ex. B-3 ¶¶ 17-19, 25-30, 36.

[22]  Because the breach of contract claim depends upon a finding that CAMICO had a duty to defend the Plaintiffs in the underlying actions, CAMICO will also be granted summary judgment on that claim.

insurer who must defend its decision to deny coverage of an

insurance claim.  Paper No. 22 at 4.  As CAMICO has failed to

address that argument or otherwise provide a legal basis for its

claim, CAMICO may not recover its costs and attorneys' fees.

III. Conclusion

For the reasons stated above, the Plaintiffs' motions to

dismiss and for summary judgment will be denied, and CAMICO's

motion for summary judgment will be granted.


March 25, 2010                   _____/s/_____
Date                             William D. Quarles, Jr.
                                 United States District Judge